E-FILED
Monday, 26 March, 2007  11:54:20 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CARL MADISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 05-3283 |
| | ) | |
| RENATTA FRAZIER, KOURTNEY | ) | |
| W. MITCHELL, RENATTA'S HEART, | ) | |
| INC., an Illinois Corporation, and | ) | |
| THE FRAZIER FOUNDATION, INC., | ) | |
| an Illinois Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

The Court allows the Defendants' Motion for Summary Judgment.

This libel and false light case is closed.

## FACTS

Renatta Frazier is a former City of Springfield police officer.  The

City's attempt to fire her led to a major investigation and a large financial

settlement.  Frazier and her son Kourtney W. Mitchell wrote a book

1

about her experiences and Renatta's Heart, Inc. published it in 2005. The book is entitled *The Enemy In Blue*.  The Frazier Foundation, Inc. markets the book.  All of these entities are Defendants in this suit.  They will be collectively referred to as "Frazier."

One of the people Frazier wrote about in *The Enemy In Blue* is Plaintiff Carl Madison ("Madison").  Madison was the president of Springfield's local National Association for the Advancement of Colored People (the "NAACP") when police officials sought to fire Frazier.  After officials initiated Frazier's firing, she contacted Madison to gain the NAACP's assistance.  Frazier included her account of her experience with Madison in *The Enemy In Blue*.

Madison, who concedes he is a public figure, contends that Frazier's book libels him and portrays him in a false light.  Frazier moves for summary judgment on Madison's claims.  The Court has read the parties' briefs and the materials submitted in support thereof.

## STANDARD OF REVIEW

A motion for summary judgment must be granted "if the pleadings,

2

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985).  When determining whether factual issues exist, a "court must view all the evidence in the light most favorable to the non-moving party." *See Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir. 1985).  However, "[s]ummary judgment is appropriately entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *See McKenzie v. Illinois Department. of Transportation*, 92 F.3d 473, 479 (7th Cir. 1996) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552 (1986)).

To successfully oppose a motion for summary judgment, the nonmoving party must do more than raise a "metaphysical doubt" as to

the material facts.  *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).  She "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Id.*  "Although [the court] must, for purposes of summary judgment review, draw any inferences from the record in favor of [the plaintiff, it is] not required to draw every conceivable inference from the record.  [It] need draw only reasonable ones."  *See Tyler v. Runyon*, 70 F.3d 458, 467 (7th Cir. 1995) (citation omitted).

## ANALYSIS

### *Madison's Libel Claim*

Libel and slander are "treated alike and the same rules apply to a defamatory statement regardless of whether the statement is written or oral."  *See Bryson v. News America Publications, Inc.,* 672 N.E.2d 1207, 1215 (Ill. 1996) (citations omitted).  To state a defamation claim, a

4

plaintiff must show that "the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Solaia Tech., LLC v. Specialty Publ'g Co.,* 852 N.E.2d 825, 839-40 (Ill. 2006) (citations omitted).  Defamatory statements are those that "harm a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Id.* at 840 (citation omitted).  Statements can be defamatory *per se* or defamatory *per quod.  Tuite v. Corbitt*, 2006 WL 3742112, *4 (Ill. 2006) (citation omitted).  Statements are defamatory *per se* if their "harm is obvious and apparent on [their] face."  *Solaia*, 852 N.E.2d at 839. Because damage to a person's reputation is not presumed in a defamation *per quod* action, a plaintiff must plead and prove special damages.  *Tuite*, 2006 WL 3742112, *4 (citation omitted).  Madison has not pled special damages.  Thus, he can only recover for *per se* defamation.

Illinois law has five types of statements that are considered defamatory *per se:* "(1) words that impute a person has committed a

crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication." *Solaia*, 852 N.E.2d at 839-40. However, statements that are reasonably capable of innocent construction are not actionable. *Id.* Under the "innocent-construction rule," a court must consider the statement in context and give natural and obvious meaning to its words and the implications arising from them. *Id.* "'[I]f, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se.*'" *Id.*, *quoting Chapski v. Copley Press,* 442 N.E.2d 195, 199 (Ill. 1982). Furthermore, defamatory *per se* statements that are not subject to innocent construction still may enjoy constitutional protection as an expression of opinion. *Id.* "'It is well established that statements made

6

in the form of insinuation, allusion, irony, or question, may be considered as defamatory as positive and direct assertions of fact.'" *Id.*, *quoting Berkos v. National Broadcasting Co.,* 515 N.E.2d 668, 689 (Ill. 1987) (citations omitted).  "[A] defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact." *Id.* (citation omitted).  In making this determination, courts consider "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Id.* (citations omitted).  "If a statement is factual, and it is false, it is actionable." *Id.*  A given statement may convey entirely different meanings when presented in different contexts.

The "fantasy section" describes Frazier's imaginary interaction with community leaders.  She "fantasized" that she was laying on the streets of Springfield bleeding.  *The Enemy In Blue*, at p.100.  In her fantasy, Frazier states:

> As I looked up, I thought I saw a lot of people standing in the distance.  I wasn't sure; I had been beaten so badly, I

felt dizzy and my vision was blurred.  I began to yell as loudly as I could: "HELP!  HELP!"  I thought maybe they couldn't hear me.  Perhaps the pain had limited my ability to yell.  Even so, I began to drag my body with all the strength that remained.  My faint yell for help seemed to go undetected.  I decided to approach the man closest to me.  He was standing with his back to me, and he appeared to have his arms folded across his chest.  "Mister," I said, "can you help me please, I've been hurt and they left me for dead."  As the man turned around to reveal his face, I was astonished and confused to see that he was black.  He didn't say anything.  He just shook his head in a right-to-left motion.  He turned his head and began to walk away.  I approached other people one by one—prominent people, leaders in the community, political figures, pastors, preachers, business owners.  All black, and all too selfish, too afraid, and too complacent to "practice what they preach."  God forbid that they risk their comfortable homes to help me.  So once again I was left for dead.

*The Enemy In Blue*, at pp. 101-02

At the end of her fantasized account, Frazier says:

In my mind, this imaginary experience was equivalent to a physical attack, a brutal beating.  As I shared this imaginary account with my husband he made a profound statement: "That this was a modern day lynching."

*The Enemy In Blue*, at p.102

Madison alleges he is the imaginary black man who shook his head.

He assumes that he is the imaginary black man and then tries to bolster his assumption by noting that the chapter which follows the fantasy section refers to Madison as a community leader. *Id.* at p.105. Madison overlooks the fact that the imaginary black man is a separate and distinct character from the community leaders mentioned in the fantasy section and elsewhere. Thus, if Madison is a community leader, he is not also the imaginary black man. Even if Madison was the imaginary black man, Frazier's statements about that character were presented as fiction. Admittedly fictitious statements about a person do not fall within any of the five categories of statements that Illinois law recognizes as defamatory *per se*. *Solaia*, 852 N.E.2d at 839-40. Furthermore, because Frazier's reference to an imaginary black man may reasonably be interpreted as someone other than Madison, the innocent construction rule would scuttle Madison's *per se* defamation claim even if such a claim existed. *Id.* at 580.

Madison also takes offense to the end of the fantasy section where, in his view, the indifferent community leaders condoned the "modern

day lynching" perpetrated on Frazier.  *The Enemy In Blue*, at p.102.

Although Madison was a real-life community leader, the event described

in the book is inactionable because Frazier presented it as fiction.  *See*

*Solaia*, 852 N.E.2d at 839-40.  Moreover, because all of the characters in

the fantasy can reasonably be interpreted as someone other than

Madison, the innocent construction rule applies to the hyperbolic

"lynching" as well.  *Id.* at 840.

The other statements at issue come from a chapter entitled

"Integrity Is: Who You Are When No One's Looking."  *The Enemy In*

*Blue*, at p.103.  Frazier describes how she contacted Madison in an effort

to have him champion her cause in his position as president of

Springfield's local branch of the NAACP.  *Id.* at pp.103-04.  Frazier

wrote:

> In the weeks that followed, I began to feel that the
> president of the local NAACP branch was not working in my
> best interest.  I spoke to him daily over the phone, and his
> conversation seemed more centered around my letting this
> matter go than fighting for the truth.  "Let's forget it, and
> sweep it under the rug."  I repeated, "Man, whose side are you
> on, mine or theirs?"  "I'm trying to get you back to work and
> put this behind you," he said.  I replied, "I know damn well

they are all wrong and they are trying to destroy my life." He
said, "Renatta, they're willing to make this go away, but I
need your cooperation." I replied, "Oh, yeah? Tell them it's
not going away and neither am I. As a matter of fact, tell
them that when they start talking dollars, then we can talk."

*Id.* at 104-05.

Later, Frazier met with a lawyer who was speaking at a Springfield

NAACP event. The lawyer had represented the NAACP in a suit against

the City of Springfield. After meeting the lawyer, Frazier wrote:

It was then that I made my decision to sever my ties with the
local NAACP branch. I spoke with Carl Madison on the
phone and said, to him, "I do not believe you are acting in my
best interest." "I am notifying you at this time that I will no
longer consult with you concerning my case." Later, I read
and heard that Mr. Madison had decided to drop me. I
couldn't believe what I was reading and hearing. . . it didn't
happen like that at all. The severing of the ties had been
done long before he made this statement. Maybe he planned
to run for some political office or was trying to obtain a
politically connected employment opportunity. Whatever the
reason, my respect for him diminished to nothing. . . .

*Id.* at p.105

Following this alleged phone call to Madison, Frazier says she

. . . had many other brushes or encounters with him, mostly
from a distance.  However close or far away the encounters
may have been, I couldn't bring myself to speak to him or
even recognize his presence.  "Real men don't lie."  I thought,
"real men don't sell out."

*Id.* at p.106.

Frazier's statements are on a par with the statements at issue in

*Solaia*.  There, a plaintiff claimed *per se* defamation because, among other

things, a defendant's written publication stated that the plaintiffs were

"deeply greedy people."  852 N.E.2d at 840.  Although the defamatory

statement was incapable of innocent construction, the Illinois Supreme

Court held that the statement was constitutionally protected opinion

because it had no precise meaning and was not verifiable.  *Id.* at 841.  In

the court's view, the statement was "judgmental," not "factual."  *Id.*

Thus, the court determined that the statement was not actionable.  *Id.*

Frazier clearly imputed a lack of integrity by wondering about

Madison's political motives and saying "Who's side are you on, mine or

theirs?" and "Real men don't sell out."  There is no innocent construction

for these comments since Frazier directed them at Madison.  However,

12

Frazier's speculation about Madison's political motives cannot reasonably be interpreted as her stating an actual fact. She wondered about his motives; she did not state that Madison was in fact motivated by political concerns. When Frazier asked "Who's side are you on, mine or theirs? . . . ", the context of her question shows that her rhetorical inquiry resulted from frustration with Madison's willingness to negotiate instead of crusade. Frazier's question was judgmental, but it was not a false statement of fact. Similarly, the phrases "real men" and "sell out" have no precise meaning and are not verifiable. Moreover, the context in which Frazier made them shows that she was judging Madison, not stating facts. Accordingly, none of the foregoing statements are actionable and Frazier is entitled to summary judgment.

This leaves the Court to consider Frazier's comment "Real men don't lie." *See The Enemy in Blue*, at p.106. Frazier made this comment after she heard Madison was claiming to have severed ties with her. *Id.* at p.105-06. In Frazier's estimation, the question of who severed ties with whom has no prejudicial affect on Madison. *See* Def.'s Br. at p. 18. It is

13

just a battle of egos.  *Id.*  To her, resolving such an issue in court would simply be a waste of judicial resources.  *Id.*

Frazier incorrectly sums up the issue.  Whether Madison suffered harm by being fired is not what propels the remainder of this suit.  What matters is whether Madison was *per se* defamed when Frazier called him a liar.  Frazier impugned Madison's integrity by alleging he was dishonest about whether he severed ties with her or she severed ties with him.  The comment asserts a statement of actual fact: Madison lied when he said that he severed ties with Frazier.  Frazier's comment is *per se* defamatory. *See Solaia*, 852 N.E2d at 841.

Despite this, Frazier asserts that the Court should dismiss Madison's claim because deciding who lied to whom would be a waste of judicial resources.  *See* Def.'s Br. at p.18.  Frazier's assertion is a curious one to say the least.  During her experience with the police department, Frazier wanted "to let truth be found."  *See The Enemy In Blue*, at p.98. She was indignant when Madison allegedly said  "Renatta, they're willing to make this go away, but I need your cooperation."  *Id.* at p.104.  Thus,

14

she responded,  "'Oh, yeah?  Tell them it's not going away and neither
am I.  As a matter of fact, tell them that when they start talking dollars,
then we can talk.'"  *Id.* at p.105.  It is hard to say from Frazier's
comments whether she was more committed to truth or money.  In any
event, it is strange to see her glibly assert that clearing one's name is not
worth expending judicial resources.  One wonders if Frazier has forgotten
about the tremendous amount of taxpayer money that was spent to clear
her name.  If Frazier had no qualms about using taxpayer resources to
vindicate herself, surely she cannot object to Madison trying to do so.
His rights are no less valid.

Frazier is, nevertheless, entitled to summary judgment because
Madison cannot show actual malice.  Following *New York Times Co. v.
Sullivan,* 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964) and *Curtis
Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975 (1967), plaintiffs
who are public figures must prove that a defendant made a false
statement with actual malice.  To establish actual malice, a defamation
plaintiff must prove that (1) the utterance was false; and (2) it was made

15

with knowledge of its falsity or in reckless disregard of whether it was false or true. *See Sullivan*, 376 U.S. at 279-80. "Reckless disregard" has been defined as proceeding to publish the defamatory matter despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth. *See St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1225-26, 20 L.Ed.2d 262, 267 (1968).

Here, Frazier claimed Madison lied when he said he severed ties with her. Frazier made that claim based on her recollection that she severed ties with Madison after meeting with the NAACP's lawyer. Madison offers no evidence to show that Frazier doubted her own recollection or the fact that she severed ties with Madison before the NAACP withdrew its assistance. Thus, Madison cannot show by clear and convincing evidence that Frazier recklessly disregarded the truth. Alone and in combination, none of Frazier's statements are actionable. She is, therefore, entitled to summary judgment on this claim.

### *Madison's False Light Invasion of Privacy Claim*

To sustain a false light invasion of privacy claim, a plaintiff must

16

plead: (1) he was placed in a false light before the public by the defendant; (2) the false light would be offensive to a reasonable person; and (3) the defendant acted with actual malice. *Salamone v. Hollinger Intl, Inc.,* 807 N.E.2d 1086, 1093 (Ill.App. 1 Dist. 2004). Because Madison's defamation *per se* claim is the basis of his false light claim, his false light claim necessarily fails. *See Seith v. Chicago Sun-Times, Inc.*, 861 N.E.2d 1117, 1130-1131 (Ill.App. 1 Dist. 2007) (when a plaintiff's defamation *per se* claim fails, his false light claim fails too).

## CONCLUSION

<u>ERGO</u>, the Defendants' Motion for Summary Judgment (d/e 19) is ALLOWED.

All pending motions are DENIED AS MOOT.

This case is CLOSED.

IT IS SO ORDERED.

ENTER:  March 26, 2007

FOR THE COURT:                    s/ Richard Mills
                                  United States District Judge

17